**Dated: July 21, 2026**

**The following is ORDERED:**



Sarah A Hall
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JUSTIN ANDREW DeJARNETT and | ) | Case No. 26-10180-SAH |
| MELISSA NICOLE DeJARNETT, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |

**ORDER ON MOTION OF THE UNITED STATES TRUSTEE TO
DISMISS CASE BASED ON THE PRESUMPTION OF ABUSE AND THE
TOTALITY OF CIRCUMSTANCES PURSUANT TO 11 U.S.C. § 707(b)
AND NOTICE OF OPPORTUNITY FOR HEARING [DOC. 14]**

On May 28, 2026, the Court conducted an evidentiary hearing on the following:

i.  Motion of the United States Trustee to Dismiss Case Based on the Presumption of Abuse and the Totality of Circumstances Pursuant to 11 U.S.C. § 707(b) and Notice of Opportunity for Hearing [Doc. 14], filed on April 8, 2026 (the "Motion"), by the United States Trustee ("UST");

ii. Debtors' Objection and Brief in Support of Objection to Motion of the United States Trustee to Dismiss Case Based on the Presumption of Abuse and the Totality of Circumstances Pursuant to 11 U.S.C. § 707(b) [Doc. 15], filed on April 29, 2026 (the "Objection"), by debtors Justin Andrew and Melissa Nicole DeJarnett (collectively, "Debtors"); and

    iii.    Reply Brief of the United States Trustee to the Debtors'
Objection to the Motion to Dismiss [Doc. 16], filed on May 4,
2026 (the "Reply"), by UST.

Marjorie J. Creasey appeared as counsel for UST, and R. Gavin Fouts appeared as counsel for

Debtors.  Debtors also appeared and testified at the hearing.  The parties agreed to admission of

all exhibits used during the hearing without objection.

### FACTS JUDICIALLY NOTICED FROM THE COURT'S DOCKET

1. Debtors filed their voluntary chapter 7 bankruptcy petition on January 22, 2026 (the
   "Petition Date").  Docket Sheet, Doc. 1.  The bankruptcy petition states Debtors' debts
   are primarily business debts.  Doc. 1, p. 7, ¶ 16.

2. Debtors' first meeting of creditors under 11 U.S.C. § 341 commenced on February 18,
   2026, and was concluded on March 3, 2026 (the "341 Meeting").  Doc. 5, Doc. entry
   dated February 20, 2026, and Doc. entry dated March 10, 2026.

3. On March 11, 2026, UST filed a Statement of Presumed Abuse [Doc. 11] (the "Statement
   of Abuse").

### STIPULATED FACTS[1]

4. On the Petition Date, Debtors' educational indebtedness had the following balances
   (collectively, the "Student Loans"):

       Debtor Justin DeJarnett:    $28,609.22

       Debtor Melissa DeJarnett:    $29,510.38

---

[1] At the commencement of the hearing, UST and Debtors orally stated their stipulations of fact
on the record.

5. The Student Loans and Tuition Debt (defined below) represent more than 50% of Debtors' aggregate scheduled debt.

6. If the Court determines the Student Loans and Tuition Debt to be consumer debt, UST and Debtors agree a presumption of abuse under Section 707(b) arises, and Debtors agree to either convert their case to chapter 13 or dismiss their case.

7. Debtors admit Debtors have sufficient income to fund a chapter 13 plan if the Student Loans and Tuition Debt are determined to be consumer debt.

8. Two issues are before the Court to resolve:

   a. Whether the Motion was timely filed; and

   b. Whether the Student Loans and Tuition Debt are consumer or non-consumer debt.

### ADDITIONAL FINDINGS OF FACT[2]

#### Debtor Melissa DeJarnett

9. Debtor Melissa DeJarnett graduated from high school in 2016 and then worked at various jobs.

10. Debtor Melissa DeJarnett commenced classes at Everett Community College in Washington in the Fall of 2020.  Her classes at Everett Community College were basic classes (most of which transferred to Whitworth University when she enrolled there).

11. Debtor Melissa DeJarnett was working towards an associate's degree at Everett Community College but never received such degree before transferring to Whitworth University, also in Washington, in 2023.

---

[2] The following findings of fact are based on Debtors' testimony and the admitted exhibits of UST and Debtors.

12. At Whitworth University, Debtor Melissa DeJarnett pursued, and continues to pursue, a business degree and has six classes remaining before graduating with her undergraduate degree.  Her ultimate goal is to obtain a master's degree.

13. At Whitworth University, Debtor Melissa DeJarnett is in a program for continuing education comprised of similarly situated working adults wanting to increase their earning potential and have better lives.[3]

14. While taking classes at Whitworth University, Debtor Melissa DeJarnett lived and continues to live off campus and worked various jobs to pay for her living expenses; she did not use the Student Loans to pay living expenses.

15. Debtors married in 2024 and then moved to Oklahoma for Debtor Melissa DeJarnett's current job, which job does not require a college degree.

16.  Debtor Melissa DeJarnett only obtained student loans while attending Whitworth University[4] and signed promissory notes therefor, none of which contain a reference to any business venture; rather, all state the loans were obtained for educational expenses only.

17. When Debtor Melissa DeJarnett applied for and obtained her Student Loans, she admitted they were not business loans, and she has never owned a business, operated a

---

[3] Specifically, Debtor Melissa DeJarnett testified her education process lead to discipline, tenacity, and personal growth, and she hopes it will open doors for her and help her make more money in the long term.

[4] UST Exhibit 11 is UST's analysis of Debtor Melissa DeJarnett's Student Loans.  The only issue taken with UST Exhibit 11 is its failure to contain payments Defendant Melissa DeJarnett made to Whitworth University and scholarships she received.  Debtors Exhibit 30 reflects the scholarships received by ($6,299) and payments personally made by Debtor Melissa DeJarnett ($1,297) prepetition.  These amounts do not, however, play a role in the Court's legal analysis.

self-proprietorship, owned a limited liability company or partnership, had outside investors, applied for a commercial loan, held a business bank account, or had an Employer Identification Number. Further, at the time she obtained her Student Loans, Debtor Melissa DeJarnett conducted no revenue generating activity.

18. UST Exhibit 11 is a chart of Debtor Melissa DeJarnett's Student Loans reflecting disbursements and refunds. It does not reflect any payments Debtor Melissa DeJarnett made directly to Whitworth University or any scholarships received by her (which are reflected on Debtors Exhibit 30).

19. Debtor Melissa DeJarnett has continued to be employed while attending Whitworth University, using the income she receives therefrom for living and household expenses.

20. Debtor Melissa DeJarnett does not and has not ever had a job requiring a college degree. She believes she can earn more money with a college degree and viewed, and views, her Student Loans as an investment in herself to further her career. Her goal is to become a chief marketing officer and hopes to continue her employment with her current employer.

21. On the Petition Date, Debtor Melissa DeJarnett owed Whitworth University $3,222 in tuition for the Spring 2026 semester (the "Tuition Debt") and paid $1,700 to Whitworth University after the Petition Date. Debtors Exhibit 30.

22. Debtor Melissa DeJarnett believes the Student Loans and Tuition Debt are non-consumer debt because consumer debt results in intrinsic value in the item itself as opposed to a future payout.

Debtor Justin DeJarnett

23. Debtor Justin DeJarnett is a 2016 high school graduate.[5] He attended college at Eastern Washington University beginning in the Fall of 2016 with the intent to obtain a degree in environmental science, believing it would lead to a position working for a large agricultural corporation and increase his ability to get into upper management. He attended Eastern Washington University until 2021 but did not complete his education and receive a degree.

24. Debtor Justin DeJarnett lived on campus at Eastern Washington University for the first two years he attended school and thereafter lived off campus.

25. In addition to his Student Loans, Debtor Justin DeJarnett's parents took out federal parent plus student loans during his first two years at Eastern Washington University when he lived on campus (the "Parent Loans"). Debtor Justin DeJarnett is not liable to repay the Parent Loans.

26. The Parent Loans were used to pay his on-campus room and board expense, personal expenses, and transportation charges; the amount of those charges roughly correspond with the amount due therefor during the Fall 2016 through Spring 2018 quarters. Debtors Exhibits 2, 9.

27. However, any monies received by Eastern Washington University for Debtor Justin DeJarnett's expenses were simply applied to the total amount due without allocation between the specific expenses (i.e. tuition, room and board, etc.) or the source (the

---

[5] While in high school, Debtor Justin DeJarnett worked some agricultural adjacent jobs as a food inspector checking shipments. His father was the agriculture teacher at the high school and FFA advisor.

Student Loans, the Parents Loans, or any other source such as scholarships and grants). Debtors Exhibits 2, 9.

28. Similarly, if any refund was due from payment of the total quarter cost during the first two years, the refund was specifically made to the Parent Loans. Debtors Exhibit 9.

29. While at Eastern Washington University, Debtor Justin DeJarnett held a variety of jobs including in a grocery store and in food service.

30. Debtor Justin DeJarnett used his wages to pay his living expenses when he lived off campus.

31. After leaving Eastern Washington University, Debtor Justin DeJarnett's jobs have been in food service and customer service and have not involved environmental science. He currently works at a bank.

32. Debtor Justin DeJarnett testified he obtained his Student Loans for educational purposes and not a business purpose. He further believes consumer debt is a debt incurred without intention or investment whereas his Student Loans were incurred to make more money in the long term and as an investment in himself to get a degree and achieve a higher paying job, i.e. for profit.[6]

---

[6] Although the Court found Debtors to generally be credible in most respects, their testimony regarding their reasons for incurring the Student Loans were, in this Court's opinion, contrived and not authentic. The Court suspects their testimony was the result of coaching from their counsel to match the line of cases defining "profit motive" as including personal investment in oneself to make more money in the future, particularly given the similar language used by both Debtors (who commenced their college careers and incurred their Student Loans without knowing each other and at different times).

33. Debtor Justin DeJarnett agreed the general reason most students take out student loans and attend college is to invest in and better themselves and increase their earning potential, which was his reason for so doing.

### RELEVANT STATUTORY AUTHORITY

11 U.S.C. § 707(b) provides, in pertinent part:

> (b)(1) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter. In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).
>
> (2)(A)(i) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of—
>
>> (I) 25% of the debtor's nonpriority unsecured claims in the case, or $8,175, whichever is greater; or
>>
>> (II) $13,650
>
> . . .
>
> (3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in paragraph (2)(A)(i) does not arise or is rebutted, the court shall consider—
>
>> (A) whether the debtor filed the petition in bad faith; or
>>
>> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the

financial need for such rejection as sought by the debtor) of
the debtor's financial situation demonstrates abuse.

## CONCLUSIONS OF LAW

In the Motion, UST argues Debtors' case should be dismissed under Section 707(b) or converted to a case under chapter 13. Debtors argue the Motion was not timely filed because UST did not timely file the "statement as to whether the debtor's case would be presumed to be an abuse under section 707(b)," required by 11 U.S.C. § 704(b)(1)[7] – referred to as the "ten day statement" or the Statement of Abuse. Debtors further argue Section 707(b)(1) does not apply to this case because their debts are not primarily consumer debts. The Court does not agree the Motion was untimely or Debtors' debts are primarily non-consumer debts. Accordingly, UST's Motion will be granted.

## I.　THE MOTION WAS TIMELY.

As a threshold matter, this Court must determine whether UST timely filed the Motion. This issue boils down to a question of statutory interpretation: whether, pursuant to Section 704(b)(1), the ten day statement must be filed within ten days after the first date set for the Section 341 meeting of creditors or, alternatively, whether an adjournment continuing a Section 341 meeting to a later date extends the time for UST to file the statement. If UST timely filed the Statement of Abuse, then the Motion was also timely filed.

Section 704(b)(1)(A) provides:

> With respect to a debtor who is an individual in a case under this chapter – (A) the United States Trustee . . . shall review all materials filed by the debtor and, not later than 10 days after the date of the first meeting of creditors, file with the court a statement

---

[7] Unless otherwise indicated, hereafter all references to sections are to the Bankruptcy Code, Title 11 of the United States Code.

9

as to whether the debtor's case would be presumed to be an abuse under section 707(b).

Courts are divided on the proper interpretation of Section 704(b). Some courts interpret the language of Section 704(b) to require the ten day statement to be filed within ten days after the date the Section 341 meeting commences. See, e.g., In re Close, 353 B.R. 915, 918 (Bankr. D. Kan. 2006), aff'd, 384 B.R. 856 (D. Kan. 2008); In re Wise, 453 B.R. 220, 226 (Bankr. D. Vt. 2011). These courts reason such an interpretation finds firmer support in the plain language of Section 704(b). According to this line of reasoning, construing Section 704(b) as referring to the conclusion of the Section 341 meeting requires courts to ignore the word "first" and add the word "conclusion" to the statute. Close, 353 B.R. at 918; see also, Wise, 453 B.R. at 226.

In contrast, other courts hold the time to file the statement runs from the conclusion of the Section 341 meeting. See, e.g., In re Persaud, 486 B.R. 251, 260 (Bankr. E.D. N.Y. 2013); Reed v. Anderson (In re Reed), 422 B.R. 214, 226 (C.D. Cal. 2009). This Court shares "[t]he view that the time to file the ten day statement begins to run from the conclusion of the § 341 meeting is the more persuasive, for a number of reasons." Persaud, 486 B.R. at 257.

This Court (Honorable T.M. Weaver) previously interpreted the plain language of Section 704(b)(2) and held the deadline contained therein refers to the date the meeting of creditors is concluded. See Order Denying Motion to Strike and Directing a Response to the Motion to Dismiss [Doc. 49], In re Sloan, No. 06-11490 (Bankr. W.D. Okla. Feb. 6, 2007) ("Sloan"). In concluding the ten day statement must be filed within ten days of the conclusion of the first meeting of creditors under Section 704(b)(1)(A), Judge Weaver noted:

> [C]learly, Congress specified the application of the earlier date when it intended to do so [in Section 521], and its failure to do so in § 704(b)(1)(A) evidences its intent that the UST not be bound to

10

file the statement of presumed abuse within 10 days of the first date set for the § 341 meeting.

. . .

Reading § 704(b)(1)(A)'s language requiring the statement of presumed abuse to be filed within '10 days after the date of the first meeting of creditors' in light of § 341 and Fed. R Bankr. P. 2003, this court finds it clear that Congress intended the operative date under § 704(b) to be the conclusion, and not the commencement, of the § 341 meeting. If Congress had intended otherwise, it would have clearly specified."

Sloan, at 4–5.[8]   Similarly, the Bankruptcy Court for the District of New Mexico emphasized Section 704(b)(1)(A) does not use the clear and unequivocal phrase "first date set" as used in Sections 521(a)(2)(B), 521(e)(2)(A)(i), Rule 3002(c)(1) and 4004(a). In re Granger, 2008 WL 5157843, at *4 (Bankr. D. N.M. 2008). The Granger court also concluded it is unnecessary to interpret the language contained in Section 704(b)(1)(A) to be the substantive equivalent of the "first date set." Granger, 2008 WL 5157843, at *4. In the same vein, this Court will not ignore Congress' choice of statutory wording in Section 704(b)(1)(A) since it is presumed to be intentional. See Stephens v. Holbrook (In re Stephens), 402 B.R. 1, 7 (10th Cir. BAP 2009).

Second, in light of the differing approaches, this Court's aim is to adhere to the approach most consistent with the policies and purposes underlying Congress' intent in enacting Section 707(b). The intended purpose of the presumption of abuse provisions enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act is "to ensure that debtors who have the ability to repay a portion of their debts be forced to do so through Chapter 13 . . . [and] eliminate the broad discrepancies in court decisions interpreting 'substantial abuse' under the

---

[8] If Congress had meant the deadline to file the ten day statement to be triggered by the first date set for the Section 341 meeting of creditors, Congress knew how to state it and chose not to use such language in Section 704(b)(1)(A). See, e.g., In re Francisco, 390 B.R. 700, 703 (10th Cir. BAP 2008).

11

prior version of § 707(b)." Granger, 2008 WL 5157843, at *4 (quoting In re Lindstrom, 381 B.R. 303, 308 (Bankr. D. Colo. 2007)). By using the conclusion of the Section 341 meeting rather than the first date set therefor, this Court will ensure (i) UST has sufficient information on which to conduct an accurate assessment of whether a presumption of abuse exists, and (ii) debtors with the ability to repay some, if not all, of their creditors will be required to do so.

Third, this Court also rejects the Close approach because it creates a series of perverse incentives. "The most compelling reason to interpret § 704(b) as requiring the ten day statement to be filed after the conclusion of the § 341 meeting is that it would be illogical to require the U.S. trustee [UST] to decide whether a presumption of abuse arises before having adequate opportunity to make that determination." Persaud, 486 B.R. at 258; Sloan, at 5. Given the occasional discrepancies in information provided by debtors, continuing the Section 341 meeting allows UST to gather required information. Reed, 422 B.R. at 225. If UST is required to file a statement of abuse within ten days of the first date set for the Section 341 meeting, UST may be unable to review all information necessary to determine whether a presumption of abuse arises, therefore frustrating the very purpose of the statute. Granger, 2008 WL 5157843, at *2. UST simply may not be able to make a presumption of abuse determination if a debtor fails to timely provide all required information. Granger, 2008 WL 5157843, at *2.

Under this Court's approach, UST may diligently investigate whether a presumption of abuse arises. If the debtor is tardy or recalcitrant in terms of turning over necessary documentation, UST may continue the Section 341 meeting until such time as all necessary information is obtained. In contrast, under Close, a debtor may withhold, intentionally or otherwise, necessary documentation in the run-up and immediate aftermath of the first date set for the meeting of creditors. UST – deprived of documents necessary to establish the full picture

12

of debtor's finances – would be unable to file a statement within ten days thereafter. The potential for heightened abuse of the Bankruptcy Code's protections is clear and must be avoided.

Accordingly, this Court concludes UST's Statement of Abuse, filed within ten days of the conclusion of the first meeting of creditors, was timely within the meaning of Section 704(b).

II.   **SECTION 707(b) APPLIES TO THIS CASE AND MANDATES EITHER CONVERSION TO CHAPTER 13 OR DISMISSAL**.

A.  **Section 707(b) Applies only to Individual Chapter 7 Debtors with Primarily Consumer Debt**.

Section 707(b)(2) and (b)(3) provide two alternatives pursuant to which a court can find relief under chapter 7 to be abusive. Section 707(b)(2) determines whether the presumption of abuse arises pursuant to the Means Test calculation of disposable income.[9] However, if the presumption of abuse does not arise or the presumption has been rebutted by the debtor establishing "special circumstances," Section 707(b)(3) determines whether abuse exists under the "totality of circumstances" test. McKay, 557 B.R. at 814; Smith, 585 B.R. at 174.

---

[9] Section 707(b)(2) requires the bankruptcy court to determine whether a presumption of abuse arises by using the "Means Test" calculation of disposable income. A presumption of abuse arises if the debtor's current monthly income reduced by amounts determined by Section 707(b)(2)(A) is greater than the threshold amounts in Section 707(b)(2)(A)(i)(I) ($8,175) or (b)(2)(A)(i)(II) ($13,650). The Means Test refers to the calculations required by Section 707(b)(2). In re McKay, 557 B.R. 810, 813-14 (Bankr. W.D. Okla. 2016); In re Smith, 585 B.R. 168, 174 (Bankr. W.D. Okla. 2018). "Essentially, the Means Test is used to determine whether a presumption of abuse arises in a debtor's bankruptcy case using a debtor's current monthly income and certain allowed deductions where the debtor's current monthly income exceeds the median family income for the applicable state and family size." McKay, 557 B.R. at 814. A debtor completes the Means Test by filing out Official Form 122A-2. The Means Test was designed "to help ensure that debtors who can pay creditors do pay them." In re Dowd, 607 B.R. 833, 836 (Bankr. E.D. Va. 2019) (citing Ransom v. FIA Card Servs., N.A., 562 U.S. 61, 64, 131 S.Ct. 716, 178 L.Ed.2d 603 (2011)).

Neither test can be applied, and the Court cannot consider whether there has been an abuse under Section 707(b) unless Debtors' indebtedness is "primarily consumer debt" as Section 707(b)(2) and (3) only apply to cases filed by individual debtors whose debts are "primarily consumer debts." In re Grillot, 578 B.R. 651, 656 (Bankr. D. Kan. 2017). Accordingly, the critical inquiry in this case is whether Debtors' Students Loans and Tuition Debt are considered consumer debt or non-consumer debt. If more than half of Debtors' aggregate debt, including the Students Loans and Tuition Debt, constitutes "consumer debt," then the "primarily consumer debts" requirement under Section 707(b)(1) is satisfied, and Section 707(b)(2) and (3) apply. Grillot, 578 B.R. at 656 (first citing Stewart v. United States Trustee (In re Stewart), 175 F.3d 796, 808 (10th Cir. 1999); then citing In re Kelly, 841 F.2d 908, 913 (9th Cir. 1988); and then citing In re Hardigan, 490 B.R. 437, 455 n.17 (Bankr. S.D. Ga. 2013)). UST bears the burden of proving by a preponderance of the evidence Debtors' chapter 7 case involves primarily consumer debts. In re Millard, 585 B.R. 182, 186 (Bankr. D. Utah 2018) (first citing Stewart, 175 F.3d at 806; and then citing Grillot, 578 B.R. at 656).

### B. In the Tenth Circuit, Non-Consumer Debt Must Have a Profit Motive.

Section 101(8) defines "consumer debt" as "debt incurred by an individual primarily for personal, family, or household use." This definition of consumer debt does not "flesh out what makes a debt a personal debt, family, or household debt." In re Sullivan, 626 B.R. 326, 331 (Bankr. D. Colo. 2021) (in the context of eligibility for Subchapter V). The Court of Appeals for the Tenth Circuit distinguishes consumer debt from "non-consumer debt" by ascertaining if the debt was incurred by the debtor with a "profit motive." Stewart, 175 F.3d at 806[10] (first

---

[10] Stewart involved student loans over $100,000 obtained by a debtor while in medical school. He used over $63,000 of the loan to pay support to his wife and for children's medical expenses,

14

citing Citizens Nat'l Bank v. Burns (In re Burns), 894 F.2d 361, 363 (10ᵗʰ Circ. 1990)[11], *accord*

Cypher Chiropractice Ctr. v. Runski (In re Runski), 102 F.3d 744, 747 (4ᵗʰ Cir. 1996); and then

citing In re Booth, 858 F.2d 1051, 1054-55 (5ᵗʰ Cir. 1988)).  Stewart further defined "'primarily'

in the context of § 707(b) as meaning consumer debt exceeding fifty percent of the total debt."

Stewart, 175 F.3d at 808.  What qualifies as consumer debt remains elusive.  Sullivan, 626 B.R.

at 331.

### C.  Palmer v. Laying is Neither Controlling nor Sound Law.

Debtors rely on Palmer v. Laying, 559 B.R. 746 (D. Colo. 2016), which reversed a lower

bankruptcy court decision and concluded "non-consumer debts include those incurred primarily

as a business investment in oneself."  The Palmer court held, to be considered non-consumer

debt, the decision to obtain a student loan must be motivated by profit as required by Stewart

and further held profit motive can be satisfied by "a business investment in oneself."  Palmer,

559 B.R. at 751.  Per Palmer, a court must consider the debtor's purpose for incurring the student

loan debt without regard to the opportunity (and incentive) for a debtor to recast the purpose to

fit the circumstances in the bankruptcy case.  Palmer, 559 B.R. at 750 (relying on Stewart v.

United States Trustee (In re Stewart), 215 B.R. 456, 465 (10ᵗʰ Cir. BAP 1997), *aff'd* Stewart,

---

with the remainder spent on living expenses, tuition, and loan processing fees.  The debtor had
also previously entered into loan agreements with his in-laws for $200,000 based on loans made
to him during his marriage to their daughter.

[11] Burns was an adversary proceeding under Section 523(a)(2), and the issue was whether the
debt was "consumer debt" such that the attorney fee recovery provision in Section 523(d)
providing for recovery of attorney fees by a prevailing debtor under certain circumstances in an
unsuccessful Section 523(a)(2)(A) adversary proceeding applied.  The debt in Burns was
determined not to be a consumer debt as it was based on a loan "in order to play the stock
market" which "is clearly a transaction entered into with a profit motive."  Burns, 894 F.2d at
363 (citing In re Almendinger, 56 B.R. 97, 99 (Bankr. N.D. Ohio 1985)).

15

175 F.3d 796)).  Finally, under <u>Palmer</u>, profit motive requires only motive and does not require profit to be realized – "provided that a debtor can show that he or she took steps to realize the potential of his or her education,[12] there is no reason why such evidence would not show that the debtor had a profit motive in incurring his or her student debt."  <u>Palmer</u>, 559 B.R. at 754.

<u>Palmer</u> is not binding on this Court,[13] and the Court views the scope and reach of its application of the <u>Stewart</u> profit motive test to be too expansive in defining non-consumer debt and contrary to Section 707(b)'s purpose – to ensure debtors with the ability to repay at least a portion of their debt do so under chapter 13.  Specifically, <u>Palmer</u> provides debtors with an opportunity to effectively recharacterize why the student loan debt was incurred after the fact and runs the risk of turning the commonly understood meaning of "consumer debt" upside down. <u>In re Millikan</u>, 2007 WL 6260855, at *5-6 (Bankr. S.D. Ind. 2007).

Debtors' testimony in this case illustrates this perfectly.  Both Debtors recited a similar answer for their motives in incurring the Student Loans and Tuition Debt– to earn more money in the future.  Debtor Justin DeJarnett specifically testified educational debt is incurred as an "investment in yourself," mirroring the language from <u>Palmer</u>.  Debtor Melissa DeJarnett was and has always been employed while attending college.  She testified her Student Loans and

---

[12] The record here contains no indication Debtor Justin DeJarnett in any form or fashion took steps to realize the benefits of his environmental science education.  Debtor Justin DeJarnett never graduated with a degree and has not been employed in any job or profession since leaving Eastern Washington University related to environmental science, having worked in food and customer service and now in a bank.

[13] "[A] decision of a federal district court judge or bankruptcy court is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."  <u>In re Jones</u>, 538 B.R. 844, 848 (Bankr. W.D. Okla. 2015) (citing <u>Fishman & Tobin, Inc. v. Tropical Shipping & Constr. Co., Ltd.</u>, 240 F.3d 956 (11th Cir.2001); <u>Threadgill v. Armstrong World Indus. Inc.</u>, 928 F.2d 1366, 1371 (3d Cir.1991)).

16

Tuition Debt were not business loans, she has not and does not own a business as a sole proprietor or through an entity, has never raised capital, sought investors, prepared financial projections, or developed a business plan.

Debtor Justin DeJarnett took out his Student Loans as a new high school graduate who worked miscellaneous jobs while attending college, none of which related to the environmental science degree being pursued but never obtained.  He testified his Student Loans were for educational purposes rather than a business purpose.  Like his wife, Debtor Justin DeJarnett has never and does not currently own a business as a sole proprietor or through an entity, has never raised capital or sought investors, or owned business bank accounts.  Their economic motive to better themselves and their ability to earn more income is no different than virtually all student loan debtors, but they rely heavily on the Palmer rationale with seemingly little to no applicable facts suggesting a true profit motive.  As said in Millikan, Debtors have tailored their "testimony to determine if a debt is to be considered a consumer or non consumer debt" by focusing on their investment in and/or bettering themselves.  Millikan, 2007 WL 6260855, at *6.

Not only is the Court not bound by Palmer, the circumstances addressed in Palmer differ significantly from the circumstances of this case.  In Palmer, the debtor was employed during his schooling.  His stated personal goal of obtaining a PhD was to advance his business knowledge and ultimately own and run a business, specifically the company for which he worked named EIS.  Palmer, 559 B.R. at 755.  Notably, the only evidence was the debtor's testimony, and he testified "he wanted to *own* a business."  Such testimony could not be more unequivocal and is the focal point of the holding.  Palmer, 559 B.R. 756.  "If wanting to own a business is not profit related, the Court does not know what is, at least where, as here, Mr. Palmer had an actual business and opportunity in mind:  owning EIS."  Palmer, 559 B.R. at 756.  Moreover, the debtor

17

took courses to help him understand how to attract customers to the business, how to build relationships with them, and more importantly how to run a profitable business. Nothing more was required in Palmer to prove the student loan debt was incurred with a profit motive and, thereby, categorized as a non-consumer debt. Palmer, 559 B.R. at 756.

Conversely, Debtors' focus has been on increasing their personal income, something most if not all student loan debtors generally desire.[14] The Palmer debtor's motive was "business" minded and associated with a specific business in which he was then employed and which was his goal of owning and growing. In this case, Debtor Justin DeJarnett was a recent high school graduate when he began college and took out his Student Loans to fund his studies. He sought, but did not obtain, a degree in environmental sciences but, during college or thereafter, was never employed in any job or owned any business in which he used the environmental science education.[15] He currently works at a bank. Debtor Melissa DeJarnett currently works in marketing and wants to become a marketing director. However, her current job does not require her to have a degree. So while Debtor Melissa DeJarnett currently works in marketing, it is as an employee with a stated goal to be a marketing director, which again is as an employee.

---

[14] Too broadly interpreting what is a non-consumer debt increases the likelihood of debtors recasting what are otherwise personal or family debts as business debt incurred with an eye toward a profit as required by Stewart. Sullivan, 626 B.R. at 331 ("Probably all courts would agree that the home mortgage debt is a consumer debt and yet the family home is the asset that most families view as their greatest investment – the one that they purchase with an eye toward appreciation in value.").

[15] Debtor Justin DeJarnett did work some agricultural adjacent jobs *while in high school*.

In contrast to the debtor in <u>Palmer</u>, neither Debtor Justin DeJarnett nor Debtor Melissa DeJarnett had or has the goal of using their college education to buy, own, or operate a business. They simply desired to improve their own skills and knowledge to hopefully allow them to improve the jobs available to them and thereby increase their earning potential. This cannot be considered a "profit" motive without essentially creating a loophole for student loan debtors to avoid application of Section 707(b), something which is neither contemplated nor warranted. Moreover, by their own admission, these Debtors have the ability to pay at least a portion of their unsecured debt under a chapter 13 plan.[16]

### D. Profit and Income Are Not Synonymous, and the Test Requires a "Profit Motive."

Debtors' stated motive for incurring their Student Loans and Tuition Debt was to increase their income earning capacity. However, their testimony and argument focuses on income rather than profit and, in this Court's opinion, is misplaced. Admittedly, the <u>Palmer</u> analysis focuses on the debtor's prospects of increased income (and on future ownership of a business),[17] but the <u>Palmer</u> analysis is, likewise, misplaced if income is the determinant of profit motive. The <u>Stewart</u> decision expressly uses the word **profit** to describe the required motive for a student loan to fall outside the definition of consumer debt. Profit and income are not, however, synonymous.

---

[16] A debtor's ability to repay his debts out of future earnings is a primary factor in determining if abuse under Section 707(b) exists. <u>Stewart</u>, 175 F.3d at 808.

[17] In <u>Palmer</u>, the debtor went back to school, while employed, to obtain a doctorate of business administration with a concentration in management. His employer did not require or pay for this additional education, and the debtor's stated goal "was to advance his business knowledge and, ultimately, own and run a business." <u>Palmer</u>, 559 B.R. at 755. In fact, the debtor wanted to buy and run his employer. <u>Palmer</u>, 559 B.R. at 755.

In Merriam Webster, profit is "a valuable return," "the excess of returns over expenditure in a transaction or series of transactions," "net income usually for a given period of time," "the ratio of profit for a given year to the amount of capital invested or to the value of sales," or "the compensation accruing to entrepreneurs for the assumption of risk in business enterprise as distinguished from wages or rent." Profit, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/profit (last visited July 1, 2026). The Cambridge Dictionary defines profit as "money that is earned in trade or business after paying the costs of producing and selling goods and services." Profit, Cambridge.org Dictionary, https://dictionary.cambridge.org/us/dictionary/english/profit (last visited July 1, 2026). In contrast, **income** is defined as "gain or recurrent benefit usually measured in money that derives from capital or labor." Income, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/income (last visited July 1, 2026). And the Cambridge Dictionary defines income as "money that is earned from doing work or received from investments." Income, Cambridge.org Dictionary, https://dictionary.cambridge.org/us/dictionary/english/income (last visited July 1, 2026).

Similarly, the courts have also defined "'profit' as 'the gain realized from a business over and above its expenditures.'" Baker v. Barnard Const. Co. Inc., 860 F.Supp. 766, 773 (D. N.M. 1994) (citing Brock v. Lauritzen, 624 F.Supp. 966, 968 (E.D. Wis. 1985), *aff'd* 835 F.2d 1529 (7th Cir. 1987), *cert. denied* 488 U.S. 898 (1988)); Brock v. Mr. W Fireworks, Inc., 814 F.2d 1042, 1050 (5th Cir. 1987) (citing Brock v. Lauritzen, 624 F.Supp. 966, 969-70 (E.D. Wis. 1985)). Profit has also been described as "the 'excess of revenues over expenditures in a business transaction.'" Orchestrate HR, Inc. v. Blue Cross & Blue Shield of Kansas, Inc.,

No. 19-4007-DDC, 2024 WL 277893, at *26 (D. Kan. Jan. 25, 2024) (citing Profit, Black's Law Dictionary (11th ed. 2019)).[18]

Looking solely at motive (which this Court suspects is somewhat manufactured in this case) without reference to how other courts have interpreted meaning of "profit" will potentially lead to most student loans being characterized as non-consumer debt. In re Steiner, No. 19-60062, 2020 WL 2027250, at *5 (Bankr. S.D. Ill. Jan. 29, 2020) ("[U]nder a broad interpretation of the profit motive test, every student loan, potentially, could be characterized as non-consumer debt.").[19] Applying a profit motive test without looking to interpretation of similar terms gives the debtor the exclusive means to characterize the student loan debt. Millikan, 2007 WL 6260855, at *6; Steiner, 2020 WL 2027250, at *6 ("Any debtor who testified that he or she incurred student loans with the hope of improving their economic future could be found to have had a profit motive."). As noted by the lower court in Palmer, focusing solely on the debtor's motivation "could, effectively, supplant the actual language of § 101(8) and 'become an exception that swallows the rule.'" Steiner, 2020 WL 2027250, at *6 (citing In re

---

[18] Although in the context of securities, the United States Supreme Court stated: "By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, as in Joiner, supra (sale of oil leases conditioned on promoters' agreement to drill exploratory well), or a participation in earnings resulting from the use of investors' funds, as in Tcherepnin v. Knight, supra (dividends on the investment based on savings and loan association's profits)." United Hous. Found., Inc. v. Forman, 421 U.S. 837, 852, 95 S. Ct. 2051, 2060, 44 L. Ed. 2d 621 (1975) (citing SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943) and then citing Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967)).

[19] Steiner ultimately does not adopt the profit motive test and looks to the totality of the circumstances as the appropriate method to determine if student loan debt constitutes consumer debt. Steiner, 2020 WL 2027250, at *6.

Palmer, 542 B.R. 289, 296 (Bankr. D. Colo. 2015), *rev'd and remanded sub nom.* Palmer, 559 B.R. 746).

In this Court's opinion, profit and income are not synonymous – profit motive necessarily means something different than income motive or the desire to increase income potential and opportunities for better jobs. Debtors' Student Loans and Tuition Debt are simply personal, family debts far removed from acceptable business debts or expenses, and something which even a quick review of chapter 7 cases suggests is entirely correct given the number of chapter 7 cases involving student loan debt classified as consumer debt.

**E. Debtors' Intent at the Time They Incurred Their Student Loans Does Not Satisfy the Profit Motive Requirement.**

Debtors did not testify to having received any profit or to having been engaged in any business which would produce profit or spin off income during or since the time they commenced their college studies and incurred their Student Loans and Tuition Debt. Both Debtors have received income, in the form of wages or salary, from employers. However, nothing in the record suggests Debtors, at the time they initially incurred their Student Loans, intended or planned for their education to lead to the establishment of a business or other activity which would produce a profit separate and apart from earned wages and salary as an employee.

Debtor Melissa DeJarnett's Student Loans and Tuition Debt are a closer call than her husband's Student Loans, but they are still ultimately consumer debts. She is currently working in marketing and hopes to obtain not only an undergraduate degree but also a master's degree in marketing and become employed as a marketing director, possibly with her current employer. No employer has required her to do this, and she is motivated by a personal desire for higher income potential. While her college education may assist Debtor Melissa DeJarnett in her future

aspiration of being a chief marketing officer, such still does not establish a profit motive separate and apart from personal wages and salary as an employee.

Similarly, Debtor Justin DeJarnett's educational quest began at age 18 and has never had a legitimate tie to a position, employer, or plan for a business which would demonstrate a profit motive different from most 18 year old student loan borrowers.  No evidence substantiates Debtors' testimony evidencing a motive different from most other student loan borrowers – to increase their income capacity.  The factual record is the key in determining motive, and "[t]he record in this case simply involves a different set of facts and circumstances than the record in Stewart."  Millard, 585 B.R. at 187 (citing Stewart, 175 F.3d 796).

Accordingly, the Court finds Debtors' Student Loans and Tuition Debt are consumer debt.

**CONCLUSION**

For the reasons set forth above, the Motion is GRANTED.  Debtors have fourteen (14) days after entry of this Order to enter into an agreed order with UST either converting this case to chapter 13 or dismissing this case.  Failure to submit an agreed order within fourteen (14) days will result in entry of an order converting this case to chapter 13.

IT IS SO ORDERED.

# # #

23